E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JEFF MITCHELL (Cal. Bar No. 236225)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0698
     Facsimile: (213) 894-3713
     E-mail:   jeff.mitchell@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 22-00183-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION RE: SENTENCING FOR DEFENDANT MATTHEW SKINNER; DECLARATION OF SA DAVID GARCIA; EXHIBITS |
| v. | |
| MATTHEW SKINNER, | |
| Defendant. | SENTENCING DATE: 10/17/2022 |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Jeff Mitchell, hereby files its position related to the sentencing of defendant MATTHEW SKINNER.

//

//

//

The government's sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Report, the attached exhibits, and such further evidence and argument as the Court may permit.

Dated: October 3, 2022       Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


            */s/ Jeff Mitchell*
JEFF MITCHELL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

In 2014, defendant created Empire West Equity, Inc. and used the entity primarily as a parent company for other real estate companies that he created and operated for the purpose of investing in real estate. (PSR ¶ 15.) From the beginning, defendant lied to his investors and falsely represented himself to be an experienced real estate investor with a track record of completing over $200 million in real estate transactions. (Id.)

In 2018, Empire West and the related investment companies experienced financial trouble and defendant was unable to pay his staff and investors. (PSR ¶ 17.) During this same time, defendant began raising money through a new real estate entity that he created and controlled called Simple Growth, LLC. Defendant promised to invest the Simple Growth funds in real estate projects, but failed to do so. None of the capital raised was invested in real estate projects. Instead, defendant used the Simple Growth investment money to pay investors from his other real estate projects, his staff, and to enrich himself. (PSR ¶ 19.)

On June 1, 2022, defendant pled guilty to a Single-Count Information that charged him with Securities Fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5. (PSR ¶¶ 1-2.)

**II. THE PRESENTENCE REPORT**

The United States Probation Office ("USPO") prepared a Presentence Report ("PSR"), which was disclosed to the parties on July 11, 2022. The PSR calculated the total offense level applicable to defendant to be 26. (PSR ¶ 46.) The PSR also calculated a criminal history category of II. (PSR ¶ 58.) The PSR calculated the

guideline sentence to be 70 to 87 months' imprisonment, between one and three years of supervised release, a fine range of $25,000 to $5,000,000, and a mandatory special assessment of $100.  (PSR ¶¶ 110, 112, 117, 118.)  The PSR also determined that restitution was mandatory under 18 U.S.C. § 3663A and calculated an amount of $1,744,946 to 22 victims.  (PSR ¶ 120.)

**III. OBJECTIONS TO THE PRESENTENCE REPORT**

The United States objects to the findings set forth in paragraph 37 of the PSR which applied a sophisticated means enhancement under USSG §2B1.1(b)(10)(C).

United States Sentencing Guidelines Section 2B1.1(b)(10)(C) provides for a two-level enhancement if two elements are met: First, "the offense otherwise involved sophisticated means," and second, "the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  Application Note 9(B) explains that the enhancement applies if the scheme was "especially complex or especially intricate . . . pertaining to the execution or concealment of an offense."  Several appellate courts have affirmed findings of sophisticated means in securities fraud cases.  See, e.g., United States v. Young, 537 Fed. Appx. 777 (9th Cir. 2013) (affirming the application of sophisticated means based on evidence that defendant used multiple accounts and corporations as part of his fraudulent scheme); United States v. Pacheco-Martinez, 791 F.3d 171 (1st Cir. 2015) (affirming sophisticated means enhancement for a defendant who made lulling payments to victims so the victims would think their investment would in fact make a return and having victims sign contract in English that differed from the Spanish version the victims had reviewed); United States v. Bistrup, 449 F.3d 873 (8th

Cir. 2006) (affirming sophisticated means enhancement in a wire fraud scheme based on defendant assuring victims that there was no risk and that the investments would yield high returns, and telling them that he had successfully invested significant sums of his own money); United States v. Stitsky, 536 Fed. Appx. 98 (2d Cir. 2013) (holding that a sophisticated means enhancement was proper based on evidence (1) that the scheme lasted several years; (2) reflected very careful planning; (3) included a careful effort to conceal the fraud by lying to business partners, lawyers, and investors; (4) relied on creating and disseminating marketing publications that contained material misrepresentations; and (5) involved the creation of fictitious documents for the purpose of convincing investors to give money or not to redeem their money from the companies).

    Here, the evidence of sophisticated means is mixed.  There is evidence that the offense used multiple shell corporations and bank accounts to raise money for his real estate projects.  (PSR ¶ 16; Declaration ¶¶ 5-8.)  The investment funds were immediately transferred to a parent account.  (Declaration ¶¶ 7-8.)  After the investment funds were commingled with different investment accounts, it made it impossible to determine whether defendant was using the investor funds as promised.  (Declaration ¶ 8.)  Defendant also made interest payments to some of his victims.  (Exhibit A at 15, 44.)

    However, the government submits there is insufficient evidence to prove the second element, i.e., that defendant "intentionally engaged in or caused the conduct constituting sophisticated means." First, defendant did not graduate from high school and lacks a background in accounting or finance.  Clearly, defendant's use of the commingled bank accounts made the analysis of the bank accounts and

use of investor funds more complicated; however, defendant used the same structure and procedures for his other real estate projects which are not part of the instant offense. Specifically, defendant commingled the funds from his other real estate projects with the parent account and paid quarterly interest to those investors.

The instant offense relates only to the Simple Growth investment, which started in 2018 when defendant's other real estate projects began experiencing financial trouble. Defendant promised to invest the Simple Growth funds in real estate projects, but instead used the funds to pay his other investors, his staff, and to enrich himself. While defendant's conduct was blatant, because he never had the intent to invest the Simple Growth funds, the scheme was not necessarily "especially complex." Based on these facts, the government does not recommend the sophisticated means enhancement.

**IV. DEFENDANT'S CRIMINAL HISTORY MAY BE UNDERSTATED**

Defendant has six prior adult convictions; however, they account for only three history points. (PSR ¶¶ 50-57.) Most of defendant's prior convictions are older and no longer qualify for criminal history points; however, defendant has a pending case in Superior Court for Domestic Violence with Injury. (PSR ¶ 56.) Defendant was convicted of this offense on June 16, 2022, and was scheduled to be sentenced on September 16, 2022; however, it was continued. Because defendant continued the sentencing in that case, the conviction only qualifies for a single criminal history point. (PSR ¶ 56.) Any sentence imposed longer than 60 days in that case would have resulted in at least two criminal history points and would have placed defendant in Criminal History Category III.

Despite the four convictions/adjudications that did not receive criminal history points, and the pending Domestic Violence sentencing, the government does not recommend an upward departure based on defendant's criminal history; however, the government submits that the Court can, and should, consider all of defendant's criminal history under the 3553(a) factors.

## V. THE GOVERNMENT'S RECOMMENDATION

As set forth herein, the United States submits that defendant should be sentenced at the high-end of the Guideline range,[1] for an overall offense level of 24 and a criminal history category II, that is, a term of 71 months' imprisonment, followed by a three-year term of supervised release, restitution in the amount of $1,744,946, and a mandatory special assessment of $100.[2]  The government does not recommend a fine in addition to the restitution, because the defendant lacks the ability to pay one.  (PSR ¶ 106.)  The recommended sentence addresses the considerations set forth at 18 U.S.C. § 3553(a), as discussed herein.

### A.   The Nature and Circumstances of The Offense

Section 3553(a)(1) provides that the Court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant.

---

[1] In United States v. Booker, 125 S. Ct. 738 (2005), the United States Supreme Court held that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  125 S. Ct. at 757.

[2] The United States, thus, hereby moves and requests the Court to grant defendant the additional 1-level reduction, pursuant to Section 3E1.1(b) of the Sentencing Guidelines based on the timely notification of defendant's intention to plead guilty.  U.S.S.G. § 3E1.1(b).

5

As described in detail in the factual basis to the plea agreement, defendant tricked and deceived 22 individuals to invest in his Simple Growth fund. Defendant promised the victims that he would invest their money in real estate projects, but failed to do so. All of the money defendant raised for Simple Growth was used to pay investors from earlier projects that had failed to return a profit, as well as to enrich himself with vacations, cosmetic surgery, and alimony payments to his ex-wife.

The PSR notes that during defendant's interview with the probation officer, defendant's counsel stated that "[t]he underlying offense occurred after [defendant] injured his back and had to go to the hospital. Everything spiraled downhill while [defendant] was on pain medication for his injuries and could not manage his business." (PSR ¶ 28.) The government disagrees with counsel's interpretation of the facts. First, the Simple Growth fund began on July 3, 2018, before the injury (Plea Agreement ¶ 12), and defendant had raised $645,929 in 2018 alone but failed to invest any of that money (Declaration ¶ 6). Further, defendant's parent company, Empire West, was essentially bankrupt before the injury but defendant failed to notify his investors.[3] Moreover, defendant employed several employees who were capable or assisting defendant invest the Simple Growth funds if he had the intention to do so; however, all of the money raised was immediately transferred to the Empire West account and used to pay investors from other projects, his staff, and his personal expenses. (Declaration ¶ 7; PSR ¶ 19.) Further, in 2020, defendant leased an Aston Martin. (PSR ¶ 98.) The government

---

[3] On October 1, 2018, the Empire West Account had a balance of $463. (PSR ¶ 20.)

submits that if defendant was well enough to lease and drive an Aston Martin, he was well enough to invest the Simple Growth funds as he promised to do.

Several of the victims were elderly and were seeking safe investment opportunities. (Exhibit A at 2, 7, 24, 30.) Defendant promised them a safe investment backed by real estate with quarterly interest payments. Defendant also promised his victims that the funds would not be used for any other purpose. (PSR ¶ 18.) Several of the victims described how defendant repeatedly lied to them and made-up excuses of why he was unable to make the quarterly interest payments. One victim described defendant as having the "gift of glib." (Exhibit A at 3.) Other witnesses, however, saw a different side when they continued to press defendant for their money. For example, defendant yelled at his landlord when she attempted to collect rent due. (Exhibit B.) As described in more detail below, defendant's aggression does not end with yelling.

### B. The History and Characteristics of the Defendant

Defendant grew up in a stable middle-class family in Southern California. Both of defendant's sibling have managed to become productive members of society and give back to their community by helping others. (PSR ¶ 67.) Defendant, on the hand, has repeatedly taken a different path.

In addition to the instant offense, defendant has six prior adult convictions and a prior juvenile adjudications that span most of his adult life. (PSR ¶¶ 50-56.) The nature of defendant's prior convictions is particularly concerning because they demonstrate a pattern of violence. With the exception of defendant's 1995 conviction of Grand Theft from Person, which does not include a

7

description of the offense, each and every one of defendant's prior convictions included violence or firearms and ammunition. From stabbing a victim in 1996 to a Domestic Violence conviction earlier this year.

The PSR also describes multiple references to Nazis and white supremacy. (PSR ¶¶ 52, 75.) Not only does defendant have or had several tattoo's related to white supremacy (PSR ¶ 75), but some of defendant's violent conduct appears attributable to white supremacy. Specifically, according to the police report, defendant's 1996 conviction began over an argument about white supremacy before defendant stabbed the victim. (PSR ¶ 52.)

When interviewed about his physical characteristics, including tattoos and scars, defendant told the probation officer that he had his name tattooed on his shoulder but neglected to mention the Nazi war bird and Swastika tattooed across his chest, and the SWP [Supreme White Power] tattoo on his arm. (PSR ¶ 75.)

There is also evidence that defendant's interest and affiliation with white supremacy may continue to this day. On May 26, 2021, the FBI searched defendant's home and found several items related to white supremacy and extremism. Specifically, the FBI found a copy of the book *The Turner Diaries* by William Luther Pierce (under the pseudonym Andrew Macdonald) on a bookshelf in his home. (Exhibit C.) The Encyclopedia Britannica recognizes this book as "the bible of the racist right," and "a blueprint for revolution." (Exhibit D.) Also inside defendant's home was a photo album with photos of defendant and other individuals displaying Swastikas and the Confederate flag. (Exhibit E.) On defendant's cell phone, the FBI found a photo of defendant displaying the "OK" hand gesture (Exhibit F), which is

recognized as a hate symbol.[4] And on defendant's laptop, the FBI found a Proud Boys manifesto (Exhibit G), which has been recognized by the ADL as an extremist group with a violent agenda.[5]

The government recognizes that defendant's affiliation with Nazi and white supremacy appears dated; however, his interest and/or affiliation with the Proud Boys appears recent. Nonetheless, the government submits that the Court can, and should, consider all of the evidence as part of defendant's history and characteristics.

**C.   THE NEED FOR THE SENTENCE IMPOSED**

Section 3553(a)(2) provides that in determining the particular sentence, the Court shall consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.

The government recognizes that defendant accepted responsibility early in this matter and waived his right to an indictment. Nonetheless, there is significant evidence to suggest that defendant may lack a proper respect for the law.

First, as previously described, defendant has six prior adult convictions and a prior juvenile adjudication that span most of his adult life. (PSR ¶¶ 50-56.) In addition, defendant had his probation and parole revoked on two occasions (PSR ¶¶ 51, 54), suggesting an unwillingness to follow rules imposed by those courts.

Further, defendant has been prohibited from possessing firearms almost his entire adult after he obtained his first felony conviction at the age of 18 years and six months. (PSR ¶ 51.) Despite his

---

[4] https://www.bbc.com/news/newsbeat-49837898
[5] https://www.adl.org/proudboys

9

early felony conviction, he was found in possession of an assault rifle and ammunition in 2014, and subsequently convicted for possession of the ammunition. (PSR ¶ 55.) In addition, defendant incurred a $150 charge on his credit card at the Oak Tree Gun Club in Newhall, California, in 2018. (Declaration ¶ 9.) The Oak Tree Gun Club is used primarily to discharge firearms in several shooting ranges. (Id.)

        **D.    NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES**

Section 3553(a)(6) provides that in determining the particular sentence, the Court shall consider the need to avoid unwarranted sentence disparities.

Defendant appears to be unique. The government is not aware of any other real estate developers in this district with a history of violence and affiliations to white supremacy who have been convicted of Securities Fraud; however, following the recommended sentencing guideline range will avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

**VI.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 71 months' imprisonment, three years of supervised release, restitution in the amount of $1,744,946, and a special assessment of $100.

DECLARATION OF DAVID GARCIA

I, David Garcia, declare as follows:

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since July 9, 2017. I am the case agent assigned to the investigation and prosecution of MATTHEW SKINNER.  I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

2.  On May 26, 2021, I participated in a search of MATTHEW SKINNER's home after obtaining a Federal search warrant, authorized by the Honorable Jacqueline Chooljian, United States Magistrate Judge.

3.  During the execution of the search warrant, I found the items attached as Exhibits C and E to the Government Position re: Sentencing of Defendant.

4.  After the execution of the search warrant, I searched defendant SKINNER's cell phone and laptop that were seized under the authority of the Search Warrant, and observed the items attached as Exhibits F and G.

5.  I have reviewed the following JP Morgan Chase Bank business accounts that are related to SKINNER and SKINNER-owned entities:

   a. Empire West ending in x0615 ("Empire West Account");
   b. Freedom Fund ending in x9292;
   c. Longacre ending in x5522; and
   d. Simple Growth ending in x9032 ("Simple Growth Account").

6.  During my review of the Simple Growth Account, I observed $1,945,559 in deposits, including $645,929 in deposits in 2018 alone.

7.  Shortly after Simple Growth began issuing bonds, the money was transferred from the Simple Growth Account to the Empire West Account, and Empire West subsequently paid its employees.  For example, on October 1, 2018, the Empire West Account had a balance of $463.  On October 9, 2018, $64,000 was transferred from the Simple Growth Account to the Empire West Account.  Between October 10 and 18, 2018, approximately $20,107.03 from the Empire West Account was disbursed to Intuit Payroll.

8.  I observed a similar pattern of transfers related to the other owner SKINNER-owned entities and bank accounts, such as Freedom Fund and Longacre.  Specifically, from at least January 2015 to August 2020, the Empire West Account received approximately 352 incoming fund credits totaling approximately $6,225,643.71.  Because SKINNER caused all of the SKINNER-owned entities to transfer their funds to the Empire West account, I was unable to determine how the funds from each investment fund were ultimately used.

9.  In 2021, I reviewed SKINNER's Capital One business credit card statements (x9400) and observed that on June 17, 2018, a purchase of $150 was made at the Oak Tree Gun Club in Newhall, California.  I consulted with SA Jared Sarkis, a certified FBI firearms instructor familiar with the Oak Tree Gun Club, who advised me that the club is primarily utilized to discharge firearms in several shooting ranges.

//
//
//

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on October 3, 2022.

_____
SA DAVID GARCIA