E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JEFF MITCHELL (Cal. Bar No. 236225)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0698
    Facsimile: (213) 894-3713
    E-mail:   jeff.mitchell@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 22-00183-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM; DECLARATION OF JEFF MITCHELL; EXHIBITS |
| v. | |
| MATTHEW SKINNER, | SENTENCING DATE: 11/21/2022 |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Jeff Mitchell, hereby files its response to Defendant's Sentencing Memorandum.

//

//

//

The government's response is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Report, the attached declaration and exhibits, and such further evidence and argument as the Court may permit.

Dated: November 14, 2022     Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


       */s/ Jeff Mitchell*
JEFF MITCHELL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

On November 6, 2022, defendant filed his Sentencing Memorandum and made numerous false and unsupported claims.  In addition, defendant asks this Court to eliminate $700,000 from the loss calculation, even though he previously stipulated to the loss amount in his plea agreement.  Not only is defendant's request in violation of the clear terms and stipulations in the plea agreement, but it would prevent those victims from obtaining restitution.

The government does not seek to hold defendant in breach of his plea agreement, but questions whether defendant has truly accepted responsibility for his conduct.  The government hereby responds to defendant's unsupported claims, and submits two additional victim impact statements in Exhibit J.

**II.  GOVERNMENT'S RESPONSE**

**A.  Bayside Project**

Defendant claims that he "invested Empire West funds into his Longacre and Bayside projects" and that "the profit from [the bayside] sale was contemplated to be used to make <u>all</u> of Mr. Skinner's investors whole."[1] (Def. Sent. Memo at 4)(emphasis added.)

Defendant's claim is misleading because the funds were not Empire West's to spend as it saw fit.  Defendant solicited investors for the Bayside project through a Private Placement Memorandum ("PPM") which contained provisions as to how the investment funds, and proceeds, were to be used.  These facts are significant because

---

[1] The Longacre and Bayside investment projects were not part of the criminal case; however, they are one of the many funds alleged in the Securities Exchange Commission's ("SEC") civil fraud case against defendant.

defendant fails to acknowledge that the profit from Bayside, if any, was required to be distributed to Bayside investors and could not be used to repay "all" of his investors from his other projects, as he claims. Indeed, the PPM for the Bayside project stated that any additional profits from Bayside would be applied to repay Bayside investors. (CV No. 21-5273-SB, Dkt. No. 38-5 at 86.)

Moreover, the district court in the civil case found that defendant misled and misappropriated funds from investors in both the Bayside and Longacre projects. (CV No. 21-5273-SB, Dkt. No. 47 at 2-3.)

**B.   Loss Amount**

Next, defendant asks this Court to exclude $700,000 from the loss calculation that were rolled over from the Freedom Fund. (Def. Memo at 4, 7, 19.)

Defendant's request contradicts the stipulations and agreements in the plea agreement. Specifically, paragraphs 2(b) and 2(c) require defendant to "not contest facts agreed to in [the plea] agreement" and to "abide by all agreements regarding sentencing." In paragraph 12, defendant agreed to a factual basis that stated:

> [I]n September 2019, defendant was unable to repay several victim-investors from a defendant-owned real estate company called Freedom Fund, and subsequently persuaded those victim investors to roll over their investments from Freedom Fund into Simple Growth after defendant promised those investors additional interest points. Defendant subsequently transferred $500,000 from a bank account in the name of Freedom Fund to a JP Morgan Chase Bank account in the name of Simple Growth (the "Simple Growth Account") based in Valencia, California.

Defendant also stipulated that the loss amount was $1,744,946, which results in a 16-level enhancement. (Plea agreement ¶¶ 12, 14.)

Despite his stipulations, defendant now argues that the money from the Freedom Fund roll-over was $700,000, and not $500,000. Not only does defendant fail to provide any evidence to support his claim, but it contradicts the plea agreement.

Further, defendant claims that the money from the Freedom Fund account that was rolled over into the Simple Growth account was "profit." (Def. Sent. Memo at 4.) Again, not only does defendant fail to provide any evidence to support his claim that the money was "profit" from the Freedom Fund project, but it contradicts the plea agreement. Defendant stipulated that the Freedom Fund project did not make a profit and "defendant was unable to repay several victim-investors from . . . Freedom Fund." (Plea Agreement ¶ 12.)

Not only is defendant's request contrary to the stipulations in his plea agreement, but it would prevent victims from receiving restitution. For these reasons, the Court should deny defendant's request to reduce the loss amount.

**C.  Defendant Was Not Incapacitated During the Offense Conduct**

Defendant claims that "from December 2018 to about August 2019 [he] was technically incapacitated by injury, fear of permanent paralysis, and the use of prescription drugs and alcohol to curb the physical and emotion pain." (Def. Sent. Memo at 5.) The government disagrees.

Defendant's Facebook posts show him working; going to a boxing gym; traveling to Boise, Idaho; at a beach; traveling to Sedona, Arizona; renting and driving a Corvette Stingray; and attending a party in San Diego. (Exhibit H.) All of these Facebook posts and activities occurred during the time that defendant claims he was incapacitated.

### D. Defendant's Role in the Offense

In his sentencing memorandum, defendant attempts to summarize the offense conduct by claiming that it "emanates from Matthew's and/or his employee's representations to investors in order to entice them to place their money into investment funds controlled by Empire West." (Def. Sent. Memo at 6.) Defendant's argument minimizes his conduct by suggesting that the offense conduct involved false representations by his employees. Not only has defendant again failed to provide any evidence to support his attempt at minimizing his conduct, but the government is not aware of any criminal conduct by his employees and his claim is not supported by the factual basis in the plea agreement.

Further, defendant's argument appears to suggest that he was aware of the false representations made by his employees. If the Court finds defendant's representations in his sentencing memorandum to be credible, the Court should find that defendant was a manager or leader of criminal activity and apply an additional two-level role adjustment, pursuant to USSG § 3B1.1(c).

### E. Athena Capital Project

Defendant claims that in December 2019 he identified a new real estate project in McAllen Texas that appears to be called Athena Capital, and subsequently entered into a contract in March 2020 to develop a 260-unit complex. Defendant claims that the profit from this project would have been used to repay the Simple Growth investors. (Def. Sent. Memo at 5.) Defendant fails to provide any evidence of his claim, and it is unclear if defendant is alleging that the Athena Capital project would have been funded by Simple Growth funds, or whether he intended to engage in another layer of a

Ponzi scheme by raising money for Athena Capital from new investors but using its proceeds to repay Simple Growth investors.

Defendant, however, cannot now claim that he intended to use Simple Growth funds to develop the Athena Capital project.  In his plea agreement, defendant stipulated that he "did not intend to purchase new real estate to develop and resell."  (Plea Agreement ¶ 12.)

Defendant also claims that the Athena Capital "project was quashed after being notified by the SEC to cease and desist."  (Def. Sent. Memo at 5.)  This again is false.  The SEC did not, and does not, send out cease and desist letters.  (Mitchell Declaration ¶¶ 3-5.)

Further, the government is not aware of a PPM or any other material that describes the Athena Capital project or how any proceeds would be raised or used.  To the government's knowledge, the only evidence discovered related to Athena Capital is defendant selling Athena Capital to his girlfriend in July 2020 for a purchase price of $1.  (Exhibit I.)

**F.   Defendant Did Not Cooperate Fully with the SEC**

Defendant claims that he "cooperated fully with the SEC investigation."  (Def. Sent. Memo at 8.)  This claim appears to be false.  The SEC filed a report with the district court in that matter that claimed that defendant repeatedly failed to engage in meaningful meet and confer sessions with the SEC and had berated the SEC attorney.  (CV No. 21-5273-SB, Dkt. No. 47 at 5.)  The district court admonished defendant to "conduct himself professionally at all times and to comply with all rules and court orders in the future."  (Id.)

**G.  Bayside Funds Cannot Be Used to Repay Simple Growth Investors**

Defendant states that he "hopes to repay restitution when the properties associated with Bayside Equity, Inc. are sold.  Matthew's company Empire West Equity, Inc., currently has a multi-million dollar property pending sale in Corona Del Mar.  Matthew hopes that the proceeds from the sale of the properties can be utilized to help pay his restitution obligation."  (Def. Sent. Memo at 14.)  This claim is misleading and concerning for several reasons.

First, this is not defendant's property as his claim suggests.  Neither defendant, Empire West, nor defendant's Bayside Equity, LP have an ownership interest in the Corona Del Mar properties.  Defendant appears to be repeating the same lies and half-truths that he used to mislead his investors.

In truth, defendant created a shell corporation called Bayside Equity, LP., and raised $3.1 million.  Bayside Equity, LP. then made an unsecured loan to Bayside, LP, a third-party who had a 45% interest in the development of the Corona Del Mar properties. (CV No. 21-5273-SB, Dkt. No. 47 at 3.)  Further, it appears that defendant misappropriated funds from that investment fund as well.  Specifically, the district court found the following:

> Between 2015 and 2015, Skinner raised $3,159,369 for Bayside to fund the project. But instead of using the money on the project, Skinner, who had exclusive control of the funds, spent $1,159,369 on Empire West's operational costs and his personal expenses, including financial support for his former spouse, luxury car leases, and payments to a former girlfriend. Bayside investors have not received a return on their principal investment.

(Id.)(internal citations omitted.)

6

Finally, even if Bayside Equity, LP ultimately makes a profit when the owner sells it, defendant cannot use any of those proceeds to repay Simple Growth or any investor from any other project. First, the PPM used by defendant in his Bayside Project required all profits to be distributed to Bayside investors. (CV No. 21-5273-SB, Dkt. No. 38-5 at 86.) Second, defendant no longer controls Bayside Equity. The district court ordered a permanent injunction prohibiting defendant from receiving any of the proceeds from the Bayside project. (CV No. 21-5273-SB, Dkt. No. 47 at 13-14.)

### H.  Defendant's History and Characteristics

Finally, defendant chastises the government for supplementing the PSR's finding of a connection between defendant's prior conviction for Conspiracy to Commit Battery with a Deadly Weapon and white supremacy. (Def. Sent. Memo at 15.) The government's sentencing position merely pointed out that there was evidence that defendant's extreme beliefs that led to violence in his past "may continue to this day."

The government is not aware of any Ninth Circuit cases that specifically address the breadth of the court's discretion when considering a defendant's history of white supremacy; however, several other circuits have found it to be a permissible 3553(a) factor. See United States v. Schmidt, 930 F.3d 858, 867-69 (7th Cir. 2019)(Holding that a district court may consider a defendant's white supremacist beliefs at sentencing for a crime that was not motivated by bias or hate because it had bearing on defendant's future dangerousness and on his disrespect for the law); United States v. Sawatzky, 994 F.3d 919, 927 (8th Cir. 2021)(Affirming district court's sentence for a Felon in Possession of Firearms after finding

7

that district court properly considered "evidence of [defendant's] racial violence, possession of racist objects, history of domestic abuse, and statements about threatening prosecutors"; noting, however, that it would be improper to impose a "sentence based on his beliefs or viewpoints"); United States v. Miner, 2021 WL 2953178 (E.D.N.Y. July 13, 2021)(District court considered defendant's "abhorrent behavior" on social media including posting photos of himself giving a Nazi salute and numerous antisemitic and racists comments when sentencing a defendant for Possession of a Defaced Firearm.)

Defendant, however, inadvertently touches upon a fine distinction.  The Court should be careful when considering defendant's political views and beliefs on race or religion, even if those beliefs are extreme or promote hate.

Defendant also makes several factual claims that are not supported by the record.  First, defendant claims that he received the Nazi tattoos while in prison, and they were subsequently removed after his release.  (Def. Sent. Memo at 15.)  The evidence in the record contradicts his claim.  Defendant was first sent to prison on January 16, 1997 (PSR ¶ 51); however, defendant already had the Nazi tattoos in April 1996 when he was arrested after stabbing a victim during an argument about white supremacy (PSR ¶¶ 52, 75).

Second, defendant claims that the government is aware that defendant removed his Nazi tattoos.  (Def. Sent. Memo at 15.)  This claim slightly distorts the facts.  On October 6, 2022, the government notified counsel by letter that two of defendant's former girlfriends were interviewed and claimed that defendant was in the process of removing the white supremacy tattoos and had scars on his

8

chest from the removal process. The government does not know the date that the removal process began, and has not verified the claims made by the ex-girlfriends.

Finally, defendant attempts to mislead the court by suggesting that the government was concerned about defendant wearing a MAGA hat in Government's Exhibit F. Government's Exhibit F was submitted to show defendant displaying the OK hand gesture which has been recognized as an extremist's symbol. Nowhere in the government's sentencing position does it mention MAGA or the hat.

### III. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 71 months' imprisonment, three years of supervised release, restitution in the amount of $1,744,946, and a special assessment of $100.

DECLARATION OF JEFF MITCHELL

I, Jeff Mitchell, declare as follows:

1. I am an Assistant United States Attorney in the United States Attorney's Office for the Central District of California. I am the attorney representing the government in this case.

2. On November 7, 2022, I spoke to Trial Attorney Lynn Dean of the Securities Exchange Commission ("SEC"). Ms. Dean advised me that she read defendant Matthew Skinner's sentencing memorandum, and that the SEC did not issue a cease and desist letter to Athena Capital or to any individual or entity in 2020, as defendant claimed in his sentencing memorandum.

3. Ms. Dean also advised me that she has never issued a cease and desist letter to an investor or other party connected to an SEC investigation or litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on November 14, 2022.

_____
JEFF MITCHELL